IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Rafael Rodriguez, ) | |
| ) | Civil Action No. 6:08-3230-GRA-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Land-O-Sun Dairies, LLC, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 25). In his complaint, the plaintiff alleges that the defendant, his former employer, (1) subjected him to racial harassment in violation of Title VII of the Civil Rights Act of 1964, as amended; (2) retaliated against him for reporting the racial harassment, also in violation of Title VII; and (3) retaliated against him for whistleblowing activity in violation of the Surface Transportation Assistance Act, 49 U.S.C. § 31105.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

From its Greenville, South Carolina, facility, the defendant delivers dairy products to retail and institutional locations throughout the upstate of South Carolina and northern Georgia. The primary means of delivery are Route Salesmen, who drive company trucks on pre-scheduled daily routes. Senior Route Salesmen are responsible for covering open routes due to personnel shortages, vacations, and similar exigencies, training new Route Salesmen, and other activities. According to the defendant, the

Senior Route Salesmen do not supervise the Route Salesmen (Wilbanks aff. ¶¶ 9, 10). The Route Salesmen and Senior Route Salesmen are supervised by the Route Manager (Wilbanks aff. ¶ 3). At all times pertinent to this litigation, the Route Manager at the Greenville location was Melvin Wilbanks (Wilbanks aff. ¶¶ 3, 6). The plaintiff notes, however, that Wilbanks referred to the Senior Route Salesmen as "supervisor" when describing the interaction between the plaintiff and the Senior Route Salesmen (pl. m.s.j. resp. at 3; *see* Wilbanks aff., attach. B).

The plaintiff was hired by the defendant in November 2007 as a Route Salesman. He worked for the defendant for less than two months, beginning shortly after Christmas 2007 and ending with his termination on February 14, 2008 (comp. ¶ 3). He worked as a Route Salesman the entire time he was with the defendant and was within his initial 90-day probationary period at the time he was terminated (comp. ¶¶ 3, 30).

Route salesmen are subject to two important regulations established by the Department of Transportation ("DOT"). First, they must be off duty for not less than 10 hours between shifts. 49 C.F.R. § 395.3(a)(2). Second, in a particular day, a driver may not continue driving after 14 hours have passed since the beginning of that day's shift (*id.*). A driver is not necessarily prohibited from working more than 14 hours in a day, but he may not continue driving beyond the fourteenth hour of active duty (*id.*).

In order to ensure compliance with DOT regulations, the defendant requires Route Salesmen and Senior Route Salesmen to complete and sign weekly timesheets recording hours of work and when they leave and return to the facility in the course of running their routes (Wilbanks aff. ¶ 4). The timesheets are sent to a company official in Johnson City, Tennessee, who evaluates compliance with DOT regulations and sends back notices when there are instances of non-compliance (*id.*). The Route

2

Salesmen and Senior Route Salesmen also carry hand-held computers that are taken on the route to record sales and product ordering information (Wilbanks aff. ¶ 5). The time that the hand-held computer is turned on and off can be used as a check to determine the accuracy of the timesheets, although the hand-held computers are not normally used to record hours of work or driving time (*id.*).

New Route Salesmen are given training concerning the DOT regulations and sign paperwork indicating their understanding of the pertinent rules. This information includes written notification of toll-free federal government Whistleblower Hotlines accompanied by a specific statement that retaliation for whistleblowing is prohibited (pl. dep., ex. 5). The plaintiff received and signed for these materials (*id.*). In addition, the plaintiff was provided a document explaining the 10-hour and 14-hour rules (pl. dep., ex. 12, PLT'S 0028). The plaintiff claimed to be an experienced driver who had worked for other dairy companies (pl. dep., ex. 1), so the defendant asserts there was no reason to doubt his understanding of these rules and whistleblower protections. The plaintiff was hired to run Route 624, serving customer locations in northern Georgia (comp. ¶ 10). Upon completing his initial paperwork and being cleared to begin work under DOT rules, the plaintiff was paired with Senior Route Salesman Jerry Brown, who ran the route with the plaintiff for several weeks in order to provide him training (comp. ¶ 13).

The plaintiff claimed that Brown used vulgar and offensive language in the truck, shouting epithets when frustrated by other drivers, including referring to black drivers as "niggers" on more than one occasion (pl. dep. 40-42). According to the plaintiff, Brown liked to listen to country music in the truck (pl. dep. 43). On one occasion, when the plaintiff put Spanish language music on the truck's radio, Brown referred to it as "fucking Mexican music," and the two men began to argue (pl. dep.

3

43-44). The plaintiff claims that this argument ultimately led to Brown calling him a "fucking Mexican" (*id.*). The plaintiff, who is a United States citizen of Puerto Rican descent, was offended and upset, although the men ultimately calmed down and completed the route that day without further incident (pl. dep. 46-48). According to the plaintiff's testimony, this was the only time Brown used any kind of racially insensitive language in reference to him (pl. dep. 48-49).

The plaintiff did not immediately report Brown's abusive language to a member of management (pl. dep. 49). However, he complained to Wilbanks about problems getting along with Brown and requested that Brown not train him anymore (pl. dep. 54). Wilbanks granted this request and assigned Senior Route Salesman Cashawn Wright to replace Brown as the plaintiff's trainer (*id.*). The plaintiff told Wright about Brown's offensive language, and Wright encouraged him to report the matter to management or Human Resources (pl. dep. 49-50).

The plaintiff then followed Wright's advice and filed a complaint against Brown (*id.*). The defendant investigated the allegations against Brown (Wilbanks aff. ¶ 15). Ultimately, Brown was suspended without pay for three days, given a final written warning, and removed permanently from the assignment of training the plaintiff (Wilbanks aff. ¶ 15, attach. A). The plaintiff claims that this was not good enough and that Brown should have been fired for failing to apologize to him (pl. dep. 52-53).

The plaintiff claims that in addition to the offensive language, Brown routinely ignored DOT regulations and instructed him to do the same. Specifically, according to the plaintiff, Brown advised him not to turn on his hand-held computer until they had reached the first stop in northern Georgia, rather than at the beginning of the shift as company policy required (comp. ¶ 22). Likewise, the plaintiff claimed Brown told him to turn off the hand-held computer before leaving Georgia at the end of the day to

return to the facility (pl. dep. 133). In this way, the plaintiff claims that Brown manipulated the starting and ending times on the computer records to create the appearance of a shorter day. After his complaint about Brown, the plaintiff was trained first by Cashawn Wright and then by Steve Floyd, both of whom were Senior Route Salesmen like Brown. The plaintiff testified that Wright was truthful with him, was "professional," was "a good milk man," and "didn't cut corners" (pl. dep. 66-67). He testified that Floyd "knew what he was doing" and "took his job serious" (pl. dep. 68). The plaintiff claims that both Wright and Floyd engaged in the same practice of failing to turn the hand-held computer on and off at the correct times[1] (pl. dep. 182-83).

The plaintiff never insisted on entering his time accurately or reported to management that he was being instructed by his trainers to enter time improperly (pl. dep. 73-76, 126). He claims to have told Floyd that he did not want to continue entering his time incorrectly, but that Floyd told him not to make such a "bold move" until he had completed his probationary period and became a union member (pl. dep. 68-70). The plaintiff never called the toll-free whistleblower numbers provided to him or otherwise endeavored to act on his alleged concerns (pl. dep. 126).

Route Manager Melvin Wilbanks, who supervised and made the decision to terminate the plaintiff, testified he was never made aware that the plaintiff was being instructed to falsify his time records or that he opposed such a practice (pl. dep. 73-76; Wilbanks aff. ¶¶ 12, 13). The plaintiff complained to Wilbanks about a variety of issues with the route and his dislike for Jerry Brown, but he never complained about having to

---

[1] With respect to Wright, the plaintiff first testified with respect to timekeeping practices on the hand-held computer that Wright "did it right" (pl. dep. 67). Then, he claimed that Wright used the hand-held computer improperly "almost all the time" (pl. dep. 141). Asked to explain the contradiction, the plaintiff admitted that he was not sure whether Wright used the hand-held computer properly or not (*id.*).

5

falsify his time records (pl. dep. 75-76). Wilbanks also did not learn of any such complaints from the Senior Route Salesmen who trained the plaintiff (Wilbanks aff. ¶¶ 12, 13; Floyd aff. ¶ 10; Wright aff. ¶ 11). However, the plaintiff argues that Wilbanks should have known that the plaintiff was falsifying his records because:

> [his] notes show that on February 5 he personally "helped him [Rodriquez] unload and check the route activity reports." See filing 24-13, p. 13. Also, Wilbanks' filings admit that he repeatedly checked the route reports to see which stops Rodriquez had missed. These records quite obviously show that the computer was being turned on within minutes of reaching the first stop and off only minutes after leaving the last one. It is difficult to believe that an experienced manager would not have notice that and, Wilbanks does not deny knowing that the practice was taking place.

(Pl. resp. m.s.j. at 5).

On January 10, 2008, the plaintiff was given a memo specifically identifying the need for complete and accurate time records to be maintained and warning that non-compliance with government regulations would result in disciplinary action (pl. dep., ex. 12, PLT'S 0029). This memo specifically identified the plaintiff, several other Route Salesmen, and two of the Senior Route Salesmen as having violated regulations (*id.*). The plaintiff was also given two individual warning notices identifying occasions when he had failed to comply with the 10-hour rule (pl. dep., ex. 6). Moreover, the plaintiff admits receiving a memo from Wilbanks requiring routes to be completed by 6:30 p.m. in order to ensure that end-of-the-day loading of trucks could be completed by 7:00 p.m (pl. dep., ex. 12, PLT'S 0040).

Wilbanks maintained a set of detailed notes of the plaintiff's performance during his probationary period (Wilbanks aff., attach. B). Specific problems included failing to remember to bring his hand-held computer and the correct products with him,

6

excessively long stops, missed stops, and consistently sloppy recordkeeping practices (*id.*, DEF'S 000052-000057). The records reveal that on some days the plaintiff recorded his time accurately while on others his start time was accurate but not his ending time, or vice versa (pl. dep., ex. 7, 8). On some days he falsified his time despite being nowhere near the 14-hour limit, and on others he kept his time accurately even though doing so brought him over the 14-hour limit (pl. dep. 131-32, ex. 6, 7, 8).

According to Wilbanks, a Georgia public school district that comprised a substantial portion of the plaintiff's route threatened to discontinue the relationship if the plaintiff did not improve his service, with the customer representative warning him "Melvin, this is getting ridiculous" (Wilbanks aff., attach. C). Later, this threat was acted upon, as the defendant lost the business for the entire school district when it was not invited to bid on the new contract (Wilbanks aff. ¶ 21). Asked for an explanation as to why the defendant was excluded from bidding, the customer representative cited poor service by the plaintiff (*id.*).

On Wednesday, February 13, 2008, the plaintiff missed at least four stops, including two schools, despite being at or between customer locations in Georgia for more than 11 hours (exclusive of driving time to and from the facility) (pl. dep., ex. 7, DEF'S 000107; Wilbanks aff., attach. B., DEF'S 000056-000057). When he returned to the facility well after 8:00 p.m., with a shipping employee waiting to assist in reloading the truck, the plaintiff immediately went home without reloading (pl. dep. 97-98). Unsure as to whether the plaintiff had quit, Wilbanks assigned a Senior Route Salesman to go out early the next morning and deliver milk to the schools in time for their breakfast service (Wilbanks aff., attach. B., DEF'S 000047, DEF'S 000057). Before the Senior Route Salesman had arrived, the plaintiff came back to the facility at 3:30 a.m. on February 14th, having been off duty for considerably less than the required 10 hours, and

took his truck back to Georgia without reloading it (*id.*). When the plaintiff returned to the facility the afternoon of February 14th, he was terminated by Wilbanks (pl. dep. 103.) According to the defendant, the termination was based on the cumulative result of numerous performance problems and customer complaints on the route, the excessively long time it took the plaintiff to run the route, and the falsification of records (pl. dep., ex. 6; Wilbanks aff., attach. B, DEF'S 000047).

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1)there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

8

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

9

## **ANALYSIS**

*Hostile Work Environment*

To establish his claim of unlawful harassment based upon race, the plaintiff must establish the following four elements: (1) unwelcome conduct, (2) based on his race, (3) sufficiently severe and pervasive to alter the terms and conditions of his employment, and (4) some basis to impute liability to the defendant. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000). To survive summary judgment, the plaintiff must demonstrate that the "workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of employment and create an abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The second element of a claim of racial harassment requires proof that the plaintiff would not have suffered the harassment "but for" his race. *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007). With respect to the third element, Title VII does not protect employees from every instance of unpleasantness in the workplace. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). The Fourth Circuit has acknowledged that Title VII does not attempt to "'purge the workplace of vulgarity.'" *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)). In determining whether allegations of harassment are severe and pervasive to fit within Title VII's parameters, the court must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hopkins*, 77 F.3d at 753 (quoting *Harris*, 510 U.S. at 23).

10

Here, the plaintiff, who is a United States citizen of Puerto Rican descent, can cite to only one comment attributable to his race: Brown calling him a "fucking Mexican" on one occasion in a dispute over what kind of music to listen to in the truck (pl. dep. 48-49, 58-60). The single incident in question did not involve any physical contact or behavior that was threatening or humiliating (pl. dep. 47-48). The plaintiff also cites Brown's alleged use of racial epithets when complaining about black drivers encountered while running the route. As argued by the defendant, the plaintiff's race was not a "but for" cause of Brown's offensive language in referring to other drivers of another race from the plaintiff. As the plaintiff cannot establish the second and third elements of a *prima facie* case, his racial harassment claim fails.

### *Title VII Retaliation*

The plaintiff next argues that he was retaliated against for reporting that Brown harassed him because of his race. The Fourth Circuit Court of Appeals has held that the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), also applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Pursuant to the *McDonnell Douglas* burden-shifting analysis, to establish his retaliation claim, a plaintiff must first establish a *prima facie* case by showing that (1) he engaged in a protected activity, (2) the employer took adverse employment action against him, and (3) his protected activity was causally connected to some adverse employment action. *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If the employer can state legitimate, non-retaliatory reasons for the adverse employment action, the plaintiff must produce evidence establishing that the employer's

11

stated reasons for the adverse action were mere pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000).

One method of establishing the "causation" element of the *prima facie* case is to demonstrate close temporal proximity between the alleged protected activity and the adverse action. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The general rule, however, is that it is not enough to recycle evidence of temporal proximity – a component of the *prima facie* case of retaliation – as proof of pretext as well. *Shoaf v. Kimberly-Clark Corp.*, 294 F. Supp.2d 746, 758 (M.D.N.C. 2003) ("Plaintiff cannot rely on temporal proximity alone to establish pretext."); *Yancey v. National Ctr. on Insts. & Alternatives*, 986 F. Supp. 945, 956 (D. Md. 1997) (granting summary judgment to employer where temporal proximity alone was offered as evidence of pretext).

The defendant does not argue that the plaintiff cannot establish a *prima facie* case of retaliation, as the plaintiff filed a harassment complaint against Brown approximately two weeks prior to his termination. The defendant argues that the claim nevertheless fails because the plaintiff lacks any evidence disputing the legitimacy of the reasons given by the defendant for his termination. This court agrees.

The evidence before the court shows that the plaintiff was terminated for legitimate, well-documented performance issues. It is uncontested that the plaintiff was the subject of repeated customer complaints, including a public school district that comprised a substantial portion of his route (Wilbanks aff. ¶ 17, attach. C). There is also no question that the plaintiff consistently was unable to finish his route in the required time. On February 13th, after several weeks of training under three different Senior Route Managers, the plaintiff missed four stops and – even subtracting out the time he spent driving to and from the route – spent 11 hours servicing the other stops (pl. dep., ex. 7,

DEF'S 000107). The plaintiff claims that the route to which he was assigned was simply too difficult for him to complete (pl. dep. 68-69). As argued by the defendant, it defies reason that the defendant would set the route up for failure, angering and ultimately losing a key customer, simply to punish the plaintiff for complaining about a racial slur. While the plaintiff claims that someone told him the route was changed after his termination (pl. resp. m.s.j. 6; pl. dep. 77-79), such evidence is inadmissible hearsay and cannot be considered by the court on a summary judgment motion). Furthermore, there is no evidence that Wilkins changed the route so that it would be more difficult for Rodriguez to perform than his predecessors.

In *Bettner v. Admin. Review Bd.*, 539 F.3d 613 (7th Cir. 2008), the court rejected a similar claim on the following grounds:

> [The plaintiff's] contention on appeal – that it was, in fact, impossible for him to complete the planned dispatches without violating the DOT hours requirement – also is insufficient to create a genuine issue of material fact. . . . Whether [the plaintiff's] failure to complete his assignments timely was due to his own inability to plan his routes or to circumstances beyond his control . . . is irrelevant to his retaliation claim. Our inquiry in a retaliation claim is limited to the belief of the decisionmakers, whether or not that belief is reasonable.

*Id.* at 622.

The plaintiff next argues that the defendant was responsible for him routinely falsifying his timesheets. The evidence shows that the falsifications in the plaintiff's timesheets had no apparent connection to the DOT regulations; the plaintiff would falsify time entries even when even the falsified information brought him out of compliance, and on other occasions his false entries were not necessary to comply with the DOT regulations. Moreover, the information on his hand-held computer did not always match his timesheets (pl. dep., ex. 7, 8). Because the timesheets rather than the

13

hand-held computer are used for monitoring DOT compliance (Wilbanks aff. ¶¶ 4, 5), it was pointless to falsify the hand-held records when the information on the timesheets was accurate. The defendant notes several examples of the plaintiff's bizarre recordkeeping are reflected on the timesheet and corresponding hand-held computer records for the week ending February 9th (pl. dep., ex. 7, DEF'S 000100-104; ex. 8, DEF'S 000121). Rather than a clever scheme to avoid DOT regulations, the evidence tends to show sloppy timekeeping. The plaintiff cannot substantiate the allegation that he was merely following orders in falsifying his timesheets. There is no evidence that the route was changed before and after his complaint about Brown. It may have been too difficult for the plaintiff, but that does not prove retaliation. Moreover, the poor service, customer complaints, missed stops, excessive time to complete the route, and sloppy, falsified time records were clearly issues of legitimate concern to Wilbanks, as his contemporaneous notes reflect.

The plaintiff argues that there was a larger volume of documentation of his poor performance after his complaint than before, showing pretext (pl. resp. m.s.j. 7-8). However, noted by the defendant, the plaintiff was given three written warnings *prior* to his complaints about Brown (def. m.s.j., ex. 12, PLT's 0029; ex. 6). His failure to remember to bring his handheld computer on the route was documented numerous times while he was still working with Brown, as was at least one customer complaint (Wilbanks aff., attach. B, DEF'S 000052-53). Moreover, on the first day Rodriguez worked with Wright, Wilbanks noted Wright's observation that Rodriguez failed to correctly load the truck, pull orders, do inventory or enter information into the handheld computer (Wilbanks aff., attach. B, DEF'S 000053).

The plaintiff also argues that "timing alone should be sufficient to require that a summary judgment motion be denied" (pl. resp. m.s.j. 8). In the case cited by the

14

plaintiff, *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248 (10th Cir. 2001), the court determined that temporal proximity established the causation prong of the plaintiff's *prima facie* case. *Id.* at 1253. In analyzing pretext, however, the court went on to require and consider additional proof casting doubt on the employer's proffered non-discriminatory explanation. *Id.* at 1253-54. Only after finding such additional proof sufficient did the court conclude that the plaintiff established pretext. *Id.* This district has followed the same approach. *See Eadie v. Anderson County Disabilities & Special Needs Bd.*, C.A. No. 8:07-3406-HMH-WMC, 2009 WL 537637, *11 n. 6 (D.S.C. Mar. 3, 2009) ("While temporal proximity is sufficient to meet the low burden required to establish a *prima facie* case of retaliation in violation of the FMLA, it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext.").

Based upon the foregoing, the plaintiff cannot establish the pretext prong of his retaliation claim, and therefore the claim fails.

*Whistleblower*

A whistleblower claim under the Surface Transportation Assistance Act is governed by the same standard as the Title VII retaliation claim discussed above. A plaintiff may establish a *prima facie* case by showing: (1) that he engaged in protected activity under the Act; (2) that he was the subject of adverse employment action; and (3) that there was a causal link between his protected activity and the adverse action of his employer. *Roadway Express, Inc. v. Dep't of Labor*, 495 F.3d 477, 481-82 (7th Cir. 2007). If the *prima facie* case is established, the pretext analysis proceeds in the same manner as in an ordinary retaliation case, evaluating the employer's legitimate non-retaliatory

15

reason for the decision against the plaintiff's evidence that such reason is pretextual. *Id.*

The plaintiff cannot establish either the *prima facie* case or the pretext prong of his whistleblower claim. First, the plaintiff cannot show that he engaged in protected activity. The Act provides protection for employees who file a complaint, begin a proceeding or testify in a proceeding concerning a commercial motor vehicle safety or security regulation, standard, or order, or whose employer perceives that the employee is about to do so. 49 U.S.C. § 31105(a)(1)(A)(i), (ii). The Act protects an employee who refuses to operate a motor vehicle in such a way as to violate a regulation, standard, or order or due to a reasonable apprehension that a serious safety or security issue may exist. *Id.* § 31105(a)(1)(B). The Act protects the accurate reporting of hours on duty. *Id.* § 31105(a)(1)(C). Finally, the Act protects cooperation and the furnishing of information to the government in connection with an investigation or proceeding under the Act. *Id.* § 31105(a)(1)(D), (E).

Despite this broad set of protections, the Act does not protect what the plaintiff did here – falsifying records and complaining verbally to co-workers that he would prefer to stop doing so. The plaintiff did not testify that he ever actually refused to enter false information in defiance of an instruction to do so. Likewise, he did not allege that he ever refused to drive when it was not safe to drive or that he participated in or initiated any kind of government investigation. While it is true that the plaintiff was faulted for missing stops, the problem was not that he cut his route short in order to comply with the regulations (he frequently failed to comply with the regulations anyway) but that he consistently left customers without their products, failing to do the job he had been hired to do. The defendant has presented evidence that in its view, the problem

16

was that the plaintiff was running the route far too slowly, not that he was refusing to work past the 14-hour limit.

The only activity the plaintiff cites that even approaches protected activity under the Act is the alleged conversation with Senior Route Salesman Steve Floyd, in which the plaintiff claims to have stated an intention to stop falsifying his time and Floyd allegedly advised him to wait for his probationary period to expire before making such a "bold move" (pl. dep. 68-70). At best, this shows that the plaintiff considered engaging in protected activity but thought better of it. Insofar as the plaintiff cannot show any protected activity, he cannot establish his whistleblower claim.

Even if the comment to Floyd was sufficient to constitute protected activity under the Act, it is undisputed that neither the plaintiff, Floyd, nor anyone else actually informed Wilbanks that the Senior Route Salesmen were allegedly instructing the plaintiff to falsify his time or that the plaintiff allegedly intended to stop doing so (Wilbanks aff. ¶¶ 12, 13; Wright aff. ¶ 11; Floyd aff. ¶ 10). When Wilbanks made the decision to terminate the plaintiff, he knew absolutely nothing about any allegations that the plaintiff was being pressured to falsify his time (Wilbanks aff. ¶¶ 12, 13).

The plaintiff argues that knowledge of the plaintiff's whistleblower status should somehow be imputed to Wilbanks by the fact that he knew the plaintiff worked excessive hours (pl. resp. m.s.j. 4-5). It is clear that Wilbanks did have such knowledge as he issued written discipline to the plaintiff three times for violating DOT rules (pl. dep., ex. 12, PLT's 0029; ex. 6). However, it is not protected activity to violate DOT rules or to falsify time records to cover up such violations. What the plaintiff has *not* shown is any evidence that he was a whistleblower and that the decisionmaker knew he was a whistleblower at the time of his termination from employment.

17

Because Wilbanks did not have this knowledge, the plaintiff cannot – as a matter of law – prove the causation element of his *prima facie* claim. *See, e.g., Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001) (without proof that the decision-maker had knowledge of the alleged whistleblowing activity, the plaintiff could not establish a causal relationship); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case."). Based upon the foregoing, this claim also fails.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 25) be granted.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

January 12, 2010

Greenville, South Carolina